[No. S042553. Aug. 1, 1996.]

ROBERT F. KENNEDY MEDICAL CENTER, Plaintiff and Appellant, v. KIMBERLY BELSHÉ, as Director, etc., Defendant and Respondent.

**COUNSEL**

Hooper, Lundy & Bookman and Patric Hooper for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Charlton G. Holland III, Assistant Attorney General, John H. Sanders and Karen L. Fried, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**GEORGE, C. J.**—Plaintiff Robert F. Kennedy Medical Center, a provider of hospital inpatient services under the California Medical Assistance Program (Medi-Cal), seeks a writ requiring the Director of the California Department of Health Services (Department) to rescind the Department's final settlement determining the amount of Medi-Cal reimbursement that is due plaintiff, because notice of the final settlement was issued more than three years after plaintiff submitted its cost reports for the years in question. Plaintiff contends that the provision in Welfare and Institutions Code section 14170, subdivision (a)(1),[1] specifying that cost report data submitted by Medi-Cal providers "shall be considered true and correct unless audited or reviewed within three years" of submission to the Department, establishes a three-year limitations period within which the Department must determine the amount of reimbursement due a provider.

We granted review to resolve a conflict between the decision reached by the Court of Appeal in the present case and the decision rendered by another division of the same Court of Appeal in *Palmdale Hospital Medical Center* v. *Department of Health Services* (1992) 8 Cal.App.4th 1306 [10 Cal.Rptr.2d 926] on this issue. For the reasons that follow, we conclude that section 14170, subdivision (a)(1), requires the Department to raise any challenge to the accuracy of the provider's cost report data within three years, but does not establish a time limitation governing the Department's final determination of the amount of reimbursement due a provider.

Accordingly, in the present case the Department complied with section 14170, subdivision (a)(1), when it issued its final audit report within three years of submission of cost reports by plaintiff for each of the years in question, and was not barred from making a final settlement (determining reimbursement liability) after expiration of that three-year period. Therefore, the judgment of the Court of Appeal, directing issuance of the writ relief sought by plaintiff, must be reversed.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

A 1992 amendment divided section 14170 into subdivisions (a) and (b). Although the version of the statute predating the 1992 amendment governed the administrative proceedings in the present case, the 1992 version, which does not contain any substantive changes significant to the present case, will be cited for the sake of clarity.

## I

The Medi-Cal program (§ 14000 et seq.) represents California's implementation of the federal Medicaid program (42 U.S.C. §§ 1396-1396v), through which the federal government provides financial assistance to states so that they may furnish medical care to qualified indigent persons. (See *Palmdale Hospital Medical Center* v. *Department of Health Services, supra,* 8 Cal.App.4th 1306, 1312.) The Department is the single state agency designated to administer the Medi-Cal program. (§ 14203.)

When originally enacted in 1965, the Medicaid Act required states to reimburse health care providers for the "reasonable cost" of hospital services rendered; the term "reasonable cost" was defined under federal standards to correspond to the cost of services *actually* incurred by a hospital provider and otherwise allowable under Medicare. (See *Wilder* v. *Virginia Hospital Assn.* (1990) 496 U.S. 498, 505, 507 [110 L.Ed.2d 455, 464, 465-466, 110 S.Ct. 2510]; *California Hospital Ass'n* v. *Obledo* (9th Cir. 1979) 602 F.2d 1357, 1358; 42 C.F.R. §§ 413.5, 413.9 (1995).) In accordance with these federal standards, former section 14105 (the predecessor to section 14170), as originally enacted, provided for hospital reimbursement on the basis of "reasonable cost for . . . services." (Stats. 1966, 2d Ex. Sess. 1965, ch. 4, § 2, p. 115.) The statute, however, did not contain any provision for an audit of a provider's expenditures under the Medi-Cal program.

In 1969, former section 14105 was amended to include, among other provisions, the following language: "Cost reports and other data submitted by providers to a state agency for the purpose of determining reasonable costs for services or establishing rates of payment shall be considered true and correct unless audited within eighteen (18) months after July 1, 1969, the close of the period covered by the report, or after the date of submission of the original or amended report by the provider, whichever is later." (Stats. 1969, ch. 1274, § 1, pp. 2486-2487.)[2] In 1973, section 14105 was amended again to extend the 18-month period governing the auditing process to 3 years. (Stats. 1973, ch. 856, § 1, p. 1548.) In 1977, the pertinent provisions of section 14105 were recodified as section 14170 (Stats. 1977, ch. 1046, § 6, pp. 3172-3173), discussed in detail, *post.*

In 1980 and 1981, in an effort to contain spiraling Medicaid costs for hospital services, Congress amended the Medicaid standard for hospital

---

[2]In 1972, in response to a federal directive requiring periodic audits of providers' cost reports, the statute was amended to include (among other provisions) the following language: "Amounts paid for services provided to Medi-Cal beneficiaries shall be audited by the department in the manner and form prescribed by the department. The department shall maintain adequate controls to insure responsibility and accountability for the expenditure of federal and state funds." (Stats. 1972, ch. 1366, § 4, p. 2719.)

reimbursement, replacing the "reasonable cost" standard with the current standard requiring states to reimburse hospital providers at rates that are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities . . . ." (42 U.S.C. § 1396(a)(13)(A); *Wilder* v. *Virginia Hospital Assn.*, *supra*, 496 U.S. at pp. 506-507 [110 L.Ed.2d at pp. 464-466].) Under this new standard, states were permitted to develop alternate methodologies to limit reimbursement based upon the costs that would have been incurred by an efficient and economically operated facility, even if a provider's actual costs were greater. (*Wilder* v. *Virginia Hospital. Assn.*, *supra*, 496 U.S. at pp. 506-507 [110 L.Ed.2d at pp, 464-466].)

In response to this change in Medicaid standards, the Department promulgated regulations imposing additional limits on the reimbursement available to a provider. The first, embodied in title 22 of the former California Administrative Code (now California Code of Regulations), section 51536 (enacted July 1, 1980), establishes a maximum reimbursement limit for hospital inpatient services, constituting the lesser of (1) customary charges, (2) allowable costs determined in accordance with applicable Medicare standards and principles of reimbursement, and (3) the "all-inclusive rate per discharge." The "all-inclusive rate per discharge" established by section 51536 determines the maximum allowable average cost per Medi-Cal patient that is reimbursable. In calculating this maximum rate per patient treated, the provider is given full credit for certain costs, such as rents and property taxes (§ 51536, subd. (b)(7)), but not for other costs (such as costs of services that have increased significantly over those incurred in prior years). The regulation also controls the amount that the all-inclusive rate per discharge may increase above the rate allowed in prior years. (§ 51536, subds. (c)-(i).) The rate must be updated annually and must incorporate data based upon a series of price indicators that may be derived from a variety of sources, including the consumer price index. (§ 51536, subd. (g).) This rate, when multiplied by the number of Medi-Cal patients treated, establishes an upper limit on the total reimbursement available to the provider. (§ 51536, subd. (b)(6).)

The Department also promulgated California Administrative Code (now California Code of Regulations), title 22, section 51539 (issued November 1, 1982), which established a "peer group" limit prohibiting reimbursement at a rate per patient greater than the 60th percentile of the rate per discharge of the provider's "peer group," established according to factors such as the size of the facility and the types of patients served. (§ 51539, subd. (b).)

Under this methodology limiting total reimbursement, the Department retained the existing reasonable cost standard (in the form of the lesser of

customary charges and allowable costs), while engrafting onto the existing standard new limitations on reimbursement—the all-inclusive rate per discharge and the peer group limit—restricting reimbursement to those costs that would have been incurred by an efficient and economically operated facility.

In order to furnish hospitals with a cash flow sufficient to provide Medi-Cal services during a particular fiscal year, the Department is authorized to make interim payments based upon the hospital provider's historical rates of Medi-Cal reimbursement for costs. (Cal. Code Regs., tit. 22, § 51536, subd. (c)(2).) At the close of the year, the provider submits its cost reports to the Department, setting forth the provider's actual costs for covered services that in the provider's view are allowable under Medi-Cal. (See 42 C.F.R. §§ 413.20, 413.24(a), (b) (1995).) Based upon the unaudited cost report data, the Department makes a "tentative settlement,"[3] reconciling the amount of interim payments with the reported unaudited costs. (Cal. Code Regs., tit. 22, § 51536, subd. (b)(9).) Thereafter, following completion of the audit process, the Department issues a final audit report and settlement, determining among other items the provider's allowable costs as established by the Department, and reconciling the difference, if any, between the tentative settlement and the final audit settlement.

The Department then undertakes the calculations necessary to determine a final reimbursement settlement[4] of Medi-Cal liabilities based upon the maximum inpatient reimbursement limit, incorporating the all-inclusive rate per discharge and the peer group limit, and utilizing the audited cost data as well as information from other sources. In this final settlement, the Department reconciles the amount of interim payments made with the maximum amount reimbursable under the regulations.

At the time of the final settlement, the hospital provider already has received interim payments corresponding to its historical rates of reimbursement for costs, as well as payments pursuant to the tentative and final audit settlements, if warranted. The Department must determine whether these payments exceed the additional limits imposed by the all-inclusive rate per

[3]"Tentative Settlement" is defined as "the Department's determination of liabilities owed, resulting from an all-inclusive rate per discharge calculation using data which has not been audited by the Department provided by a hospital for the hospital's accounting year." (Cal. Code Regs., tit. 22, § 51536, subd. (b)(9).)

[4]"Final Settlement" is defined to mean "a Department determination of liabilities owed resulting from an all-inclusive rate per discharge calculation based upon data audited and edited by the Department and/or upon data provided by the Office of Statewide Health Planning and Development as being true and correct for the final settlement year." (Cal. Code Regs., tit. 22, § 51536, subd. (b)(10).)

discharge and the peer group limit. Because the total reimbursement liability, as limited under California Code of Regulations, title 22, sections 51536 and 51539, generally will not exceed the amount of interim payments, usually the most favorable final settlement that may be obtained by a provider is a determination that the Department is not entitled to recoup any moneys previously paid to the provider.

## II

This case concerns the determination of reimbursement owed to plaintiff for Medi-Cal services provided during the years ending December 31, 1982, December 31, 1983, and December 31, 1985.

Plaintiff timely filed its cost reports for the years in question, and the Department issued its final audit report and its final audit settlement for each of the years in question in 1984, 1987, and 1988, respectively, all within three years of issuance of the cost reports. On July 12, 1990, the Department issued a notice of final reimbursement settlement that applied the all-inclusive rate per discharge and peer group limits pursuant to California Code of Regulations, title 22, sections 51536 and 51539. Under the final settlement, the Department sought to recoup from plaintiff substantial over-payments of Medi-Cal reimbursement moneys that had been paid to plaintiff on an interim basis for each of the years in question.

Following an administrative adjustment to the final reimbursement settlement,[5] plaintiff filed a request for an administrative hearing for each of the periods in question, asserting, among other claims, that the July 12, 1990, final settlement—incorporating the adjustments reducing reimbursement under California Code of Regulations, title 22, sections 51536 and 51539—was untimely because it was not issued within three years of plaintiff's submission of its cost reports for the years in question. This claim was premised upon plaintiff's position that the three-year time limitation set forth in Welfare and Institutions Code section 14170, for auditing "[c]ost reports and other data submitted by providers," applied to the issuance of a final reimbursement settlement. Following an administrative hearing, the Department rejected plaintiff's claim that the final settlement adjusted pursuant to California Code of Regulations, title 22, sections 51536 and 51539 was untimely.

---

[5]Plaintiff requested an administrative adjustment of the final reimbursement settlement pursuant to California Code of Regulations, title 22, sections 51536, subdivision (j), and 51539, subdivision (d), for each of the years in question. The Department granted the request in part, substantially reducing the amount of plaintiff's repayment liability.

On October 14, 1992, plaintiff filed in superior court a petition for writ of mandate (Code Civ. Proc., § 1094.5), seeking an order directing the Department to rescind the final settlements adjusting reimbursement liability pursuant to California Code of Regulations, title 22, sections 51536 and 51539, on the ground that these settlements were issued beyond the three-year period prescribed by Welfare and Institutions Code section 14170. Plaintiff alternatively argued that if the three-year limitation under Welfare and Institutions Code section 14170 was inapplicable, the three-year limitation under Code of Civil Procedure section 338, subdivisions (a) (governing "[a]n action upon a liability created by statute, other than a penalty or forfeiture") or (d) (governing "[a]n action for relief on the ground of fraud or mistake"), controlled the final reimbursement determination.[6] The superior court denied the petition.

On appeal, the Court of Appeal reversed, concluding that under Welfare and Institutions Code section 14170, subdivision (a)(1), the entire reimbursement settlement procedure, including adjustments applying the all-inclusive rate-per-discharge and peer group limits under California Code of Regulations, title 22, sections 51536 and 51539, had to be concluded within the three-year period prescribed by the statute. The appellate court acknowledged, but declined to follow, *Palmdale Hospital Medical Center* v. *Department of Health Services, supra,* 8 Cal.App.4th 1306, a decision rendered by another division of the Second Appellate District that reached the opposite holding on the identical issue.

We granted the Department's petition for review to resolve the conflict between the published decisions of the Court of Appeal.

### III

Section 14170, subdivision (a)(1), provides in pertinent part: "Cost reports and other data submitted by providers to a state agency for the purpose of determining reasonable costs for services or establishing rates of payment shall be considered true and correct unless audited or reviewed within three years after the close of the period covered by the report, or after the date of submission of the original or amended report by the provider, whichever is later." (§ 14170, subd. (a)(1).)[7]

█ Since the date of enactment of this three-year time limitation (originally in 1973, in former Welfare and Institutions Code section 14105),

---

[6]On appeal, plaintiff abandoned reliance upon subdivision (d) of Code of Civil Procedure section 338, instead relying solely upon subdivision (a) of that statute.

[7]The statute contains three exceptions to the three-year auditing requirement, none of which is applicable in the present case: "Nothing in this section shall be construed to limit the correction of cost reports or rates of payment when inaccuracies are determined to be the result of intent to defraud, or when a delay in the completion of an audit is the result of willful

the Department consistently has construed it as applicable solely to the Department's procedures for auditing a provider's cost report data. Plaintiff maintains that the Department's narrow application of this provision contravenes the legislative intent to require the Department to reach a final reimbursement determination within three years of a hospital provider's submission of its cost reports. According to plaintiff, the entire reimbursement procedure, including adjustments incorporating the all-inclusive rate per discharge and peer group limits under California Code of Regulations, title 22, sections 51536 and 51539, must be conducted within this three-year period.

■ In construing the significance of the three-year limitation period, our primary objective is to ascertain and effectuate the legislative intent, turning first to the statutory language, giving effect to the ordinary meaning of the words employed. (*Burden* v. *Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].) "Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history." (*Id.* at p. 562; *California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].) ■ As the Court of Appeal recognized in *Palmdale Hospital Medical Center* v. *Department of Health Services, supra,* 8 Cal.App.4th at pages 1313-1314, under the plain statutory language of section 14170, "the *sole* consequence of the Department's failure to audit or review a provider's cost report or other data within three years is that such information 'shall be considered true and correct.' [Citation.] Plainly, unless one of the statutory exceptions applies, the Department cannot question the information submitted by the provider once the three-year period has expired. *That restriction, however, does not address the utilization of the cost data submitted in determining the actual amount of reimbursement a provider shall receive.*" (Italics added.) In other words, the statute requires that any audit of a provider's cost reports be conducted within three years, but does not state that the determination of a provider's "reasonable costs" based upon the cost reports must be made within this three-year period, nor does it require that the final determination of the Department's reimbursement liability be made within this period.

Thus, the statutory language reflects an apparent legislative intent simply to require the Department to perform an audit within three years from the date of the filing of the provider's cost reports.

The legislative history of the statute further clarifies the limited scope of the three-year time requirement under Welfare and Institutions Code section

acts by the provider or inability to reach agreement on the terms of final settlement." (§ 14170, subd. (a)(2).)

14170, subdivision (a)(1). As explained above, when the time requirement for auditing cost reports originally was added to the Welfare and Institutions Code (in former section 14105), the determination of the amount of reimbursement was based essentially upon the "reasonable cost" standard under Medicare and, therefore, was determined primarily by an audit of a hospital's cost report data. It is clear that the procedure for auditing cost report data did not encompass the application of the formulae under California Code of Regulations, title 22, sections 51536 and 51539, because those regulations had not been promulgated at the time of the enactment and reenactment of the time limitation for the audit process (in 1969, 1973, and 1977).

With the Department's promulgation of the cost-containment measures in California Code of Regulations, title 22, sections 51536 and 51539, the audited cost report data—relating primarily to the determination of allowable costs—became only one factor in the final determination of reimbursement liability. Reimbursement now is based upon the lesser of the customary charges or allowable costs determined in accordance with Medicare standards and principles of reimbursement, limited by the all-inclusive rate per discharge and the peer group limits. (Cal. Code Regs., tit. 22, §§ 51536, 51539.) The final determination of the amount of reimbursement due a provider, therefore, requires calculations beyond the mere auditing of the hospital's cost report data. (*Palmdale Hospital Medical Center* v. *Department of Health Services, supra,* 8 Cal.App.4th at p. 1314.) For example, as noted above, the all-inclusive rate per discharge must be updated annually and must incorporate data based upon a series of price indicators from sources other than a provider's cost reports. A final resolution of the all-inclusive rate per discharge for a given year cannot be calculated until the foregoing rate for all prior years has been determined, including appeals from determinations as to the all-inclusive rate per discharge. (Cal. Code Regs., tit. 22, § 51536, subd. (c).) Additional information also must be obtained to determine the rate per discharge of a hospital's peer group, in order to comply with the limitation that reimbursement not exceed the 60th percentile of the rate per discharge of the hospital's peer group. (Cal. Code Regs., tit. 22, § 51539, subd. (b).) The peer group limit cannot be determined finally until the all-inclusive rate per discharge of each hospital in the peer group has been determined.

Thus, the cost report data submitted by the provider at the close of each year constitutes only a portion of the information necessary for the final determination of the provider's Medi-Cal reimbursement. We may not assume that the Legislature intended to circumscribe the new reimbursement determination procedures (under the cost-containment formulae) within the

same three-year period that it presumptively had deemed a reasonable period for only the audit of a provider's cost data. If section 14170's three-year time requirement were construed to apply to the entire reimbursement settlement procedure, the Department would be restricted to a time period in which to complete the audit process that would be substantially shorter than the three-year period originally provided under the statute.

A telling indication that the Legislature recognized the distinction between the audit process and the final determination of the amount of reimbursement liability is found in the administrative appeal provisions of section 14171. That statute (as originally enacted in 1977, and currently) provides that "[t]he director shall establish administrative appeal processes to review grievances or complaints arising from the findings of an *audit or examination made pursuant to Section* [] . . . *14170.*" (§ 14171, subd. (a), italics added.) Consistent with this statutory authority, the regulations establish detailed appeal procedures applicable to the audit process, including an appeal from a final audit report. (Cal. Code Regs., tit. 22, § 51016 et seq.)

Subsequent to the promulgation of California Code of Regulations, title 22, sections 51536 and 51539, Welfare and Institutions Code section 14171 was amended to provide specifically for procedures for appeals from tentative and final settlements, based upon application of these cost-containment measures (§ 14171, subds. (b)-(d)), that are *separate and distinct from the audit appeal procedures* set forth in the California Code of Regulations. California Code of Regulations, title 22, sections 51536 and 51539, additionally contain an informal appeal mechanism (in the form of a request for an administrative adjustment) from a determination of the all-inclusive rate per discharge and the peer group limits imposed by these provisions. (Cal. Code Regs., tit. 22, §§ 51536, subd. (j), 51539, subd. (d).)

If, as plaintiff contends, the audit process that must be completed within three years under section 14170, subdivision (a)(1), includes the determination of the all-inclusive rate per discharge and peer group limits, separate appeal procedures for final settlements incorporating the cost-containment formulae would have been unnecessary, because the provisions governing appeals from the final audit report and final audit settlement also would apply to appeals from a final reimbursement settlement.

Instead, in amending Welfare and Institutions Code section 14171 following the promulgation of California Code of Regulations, title 22, sections 51536 and 51539, the Legislature contemplated that the audit process and the adjustments under the regulations constituted two separate, distinct procedures that are governed by different appeal processes.

In reaching a contrary construction of section 14170, subdivision (a)(1), the Court of Appeal reasoned that unless the entire reimbursement settlement procedure were governed by the three-year limitation, it would be unnecessary to include the exceptions to the time limitation, set forth in subdivision (a)(2) of the statute, that apply "when inaccuracies are determined to be the result of intent to defraud, or when a delay in the completion of an audit is the result of willful acts by the provider or inability to reach agreement on the terms of final settlement."

By its terms, however, subdivision (a)(2) of section 14170 simply permits "the correction of cost reports or rates of payment" after the expiration of the three-year period when the provider has attempted to defraud the Department or when the determination of the final audit settlement has been delayed either by willful acts of the provider or inability of the parties to reach an agreement. Nothing in the statutory language refers to the final reimbursement determination. Thus, contrary to the rationale of the Court of Appeal, a construction applying the three-year time limitation solely to the auditing process does not render meaningless the exceptions to this time requirement.

Finally, as stated previously, the Department—the administrative agency charged with implementation of the Medi-Cal program—consistently has interpreted the three-year time requirement under section 14170, subdivision (a)(1), as governing solely the audit process, and not requiring completion of the total reimbursement procedure within that three-year period. The Legislature has affirmed this administrative interpretation by repeatedly amending and reenacting the statutory provision containing the time limitation, without altering the statutory language to provide that the final reimbursement determination must be made within the three-year period. (See *Industrial Welfare Com.* v. *Superior Court* (1980) 27 Cal.3d 690, 708-709 [166 Cal.Rptr. 331, 613 P.2d 579] [" '[r]eenactment of a provision which has a meaning well established by administrative construction is persuasive that the intent was to continue the same construction previously recognized and applied' "]; *Coca-Cola Co.* v. *State Bd. of Equalization* (1945) 25 Cal.2d 918, 922 [156 P.2d 1].)

Plaintiff acknowledges that, because the final reimbursement settlement generally will give rise to a *provider's liability for repayment* of Medi-Cal moneys, the Department's delay in reaching a final reimbursement settlement does not result in the withholding of moneys from the provider. Instead, the provider generally will reap the benefit of the interest-free use of

government funds to which the provider is not entitled.[8] Plaintiff maintains a provider nevertheless is prejudiced financially by the delay, because the uncertainty as to large contingent claims hampers financial planning necessary for successful business operations. That circumstance is a matter properly to be remedied by the Legislature, however, and not by judicial fiat, in the absence of a time requirement established by the Legislature governing the Department's final reimbursement determination.

For the foregoing reasons, we conclude the three-year time requirement under Welfare and Institutions Code section 14170, subdivision (a)(1), does not govern the final determination of reimbursement liability, including adjustments limiting reimbursement under California Code of Regulations, title 22, sections 51536 and 51539. Instead, the time limitation establishes only that the provider's cost report data shall be considered true and correct unless audited by the Department within three years.

Plaintiff finally contends that in the event the three-year time requirement under section 14170, subdivision (a)(1), is inapplicable to the final reimbursement determination, alternatively the three-year limitations period under Code of Civil Procedure section 338, subdivision (a) (governing "[a]n action upon a liability created by statute, other than a penalty or forfeiture") is applicable.

Because the Court of Appeal held that the three-year time limitation under section 14170 governed the final reimbursement determination, that court had no occasion to address the issue of the applicability of limitation periods under the Code of Civil Procedure. We conclude that the Court of Appeal should pass on this issue in the first instance, and accordingly we shall remand the matter to that court for this purpose.[9]

## IV

The judgment of the Court of Appeal, directing issuance of the writ of mandate sought by plaintiff, is reversed, and the matter is remanded to the Court of Appeal with directions to conduct further proceedings consistent with the views expressed in this opinion.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

---

[8]Interest on the amount of a provider's liability for repayment does not commence to accrue until following a demand by the Department for recoupment of overpayment. (§ 14171.)

[9]Under appropriate circumstances, the defense of laches may operate as a bar to a claim by a public administrative agency, such as the Department, if the requirements of unreasonable delay and resulting prejudice are met. (See *Steen* v. *City of Los Angeles* (1948) 31 Cal.2d 542, 546 [190 P.2d 937] [a trial court has inherent power independent of statutory provisions to dismiss an administrative proceeding when the proceeding is not diligently prosecuted]; *Gates* v. *Department of Motor Vehicles* (1979) 94 Cal.App.3d 921, 925 [156 Cal.Rptr. 791].)

MOSK, J.—I dissent. The majority conclude that the Legislature intended to burden providers of health care under the California Medical Assistance Program (Medi-Cal) with potentially open-ended financial liability to the State Department of Health Services (department). Certainly that cannot be. The Court of Appeal reached the correct result, and its judgment should be affirmed. Because the majority hold to the contrary, however, it will take a legislative act to remove the onerous financial uncertainty to which today's decision subjects these health care enterprises.

Subdivision (a) of Welfare and Institutions Code section 14170—unlabeled statutory references are to this code—provides:

"(1) Amounts paid for services provided to Medi-Cal beneficiaries shall be audited by the department in the manner and form prescribed by the department. The department shall maintain adequate controls to ensure responsibility and accountability for the expenditure of federal and state funds. Cost reports and other data submitted by providers to a state agency for the purpose of determining reasonable costs for services or establishing rates of payment shall be considered true and correct unless audited or reviewed by the department within 18 months after July 1, 1969, the close of the period covered by the report, or after the date of submission of the original or amended report by the provider, whichever is later. Moreover the cost reports and other data for cost reporting periods beginning on January 1, 1972, and thereafter shall be considered true and correct unless audited or reviewed within three years after the close of the period covered by the report, or after the date of submission of the original or amended report by the provider, whichever is later.

"(2) Nothing in this section shall be construed to limit the correction of cost reports or rates of payment when inaccuracies are determined to be the result of intent to defraud, or when a delay in the completion of an audit is the result of willful acts by the provider or inability to reach agreement on the terms of final settlement."

The statute is not a model of clarity. Cost reports are submitted to the department, however, "for the purpose of determining reasonable costs for services or establishing rates of payment . . . ." (§ 14170, subd. (a)(1).) This implies that the audit should determine the amount of money due, not just the accuracy of the provider's figures. Subdivision (a)(2) of section 14170 supports this conclusion by providing that "rates of payment" may be corrected "when a delay in the completion of an audit is the result of . . . inability to reach agreement on the terms of final settlement." Indeed,

although "audit" is not defined for purposes of the statute in question (see, however, § 11227), standard definitions thereof include a "final statement of account" (Webster's New Internat. Dict. (3d ed. 1961) p. 143) and a "rendering and settling of accounts" (*ibid.*).

Naturally, as the last step in the audit process, a final settlement cannot be reached until the audit findings have been made. (See Cal. Code Regs., tit. 22, § 51536, subd. (b)(10).) The question is whether the whole process must be completed in three years. Section 14170 implies that it must. Contrary to the majority's observations, nothing in section 14171 undermines such a conclusion. Subdivisions (a) and (b) thereof merely establish that a Medi-Cal provider may challenge either the audit findings or the resulting settlement.

The majority impose a double standard regarding the parties' obligations. The state as reimburser is to be indulged, while the hapless Medi-Cal provider is to tolerate whatever delays or other burdens the former may impose. The Court of Appeal reasonably questioned whether the Legislature intended a process whereby a hospital would be dunned for payments made years earlier. "In its multiyear inpatient reimbursement settlement dated July 1990," the appellate court explained, "the Department sought to recoup more than $400,000 for services rendered by Kennedy to Medi-Cal patients seven years earlier, in 1982; more than $800,000 for services rendered six years earlier, in 1983; and more than $200,000 for services four years earlier, in 1985. Few businesses could operate successfully if [their] financial position were to remain so long unknown and imperiled." (Italics deleted.) By contrast, the majority appear to believe that the Legislature meant for providers to sustain the burden of open-ended delays in calculating final reimbursement. This is a strange view of commercial reality.

Even as the majority conclude that the Legislature intended to subject Medi-Cal providers to a harsh regime, they themselves manifest an avuncularly tolerant view of the department's obligations toward those enterprises. They appear to believe that the agency cannot reasonably be expected to settle a provider's account in three years. To be sure, the calculations required for final settlement appear to be complex. But at least some data are regularly and periodically obtainable. For example, the department must consider changes in consumer and producer price indices in calculating the sums due the provider. (Cal. Code Regs., tit. 22, § 51536, subds. (b)(6), (f), & (g).) The Bureau of Labor Statistics of the United States Department of Labor (see 29 U.S.C. §§ 1, 2) calculates consumer and producer price indices monthly or annually. (Statistical Abstract of the United States (115th ed. 1995) pp. 492-495, 500-503.) Surely the Legislature could have decided that three years *after* the Medi-Cal provider submitted all relevant information was adequate time to settle an account.

The majority's indulgent view of the department's obligations dovetails all too comfortably with the department's own attitude. In its July 12, 1990, letter to plaintiff demanding that it repay $1,564,109.37 for periods ending as much as seven and a half years before, the department insisted that "[i]f you did not own the hospital during this fiscal period and are not responsible for Medi-Cal liabilities for this fiscal period, you should immediately forward this notice to the former owners." (The department does not casually invoke the term "immediately," for in contrast to the limitless time it believes it enjoys to settle an account, it gave the provider in this case 67 days to prepare and send a request for administrative adjustment, and there is no indication in the letter that any prior provider would receive an extension.) Certainly the department maintains records of prior providers and could easily submit notice to them, but evidently it prefers to assign this task to the current provider, thus jeopardizing the financial position of all past as well as present providers subject to the final settlement in question.

Finally, to put a quicker end to this litigation and allow the Legislature to address any resulting difficulties for health care enterprises, I would decide the question whether the three-year statute of limitations contained in Code of Civil Procedure section 338, subdivision (a), applies. There is no reason not to do so. The majority's remand to the Court of Appeal unnecessarily expends the resources of both that court and these litigants.

In a suggestion that probably is meant to be palliative, the majority propose that a provider may present a defense of laches. But plaintiff may be understood already to have said, as it were, "Thanks but no thanks." The record contains its observation that the "suggestion . . . that the doctrine of laches may provide a remedy for a provider when its final settlement is delayed must be rejected as impracticable and unrealistic. Under [that] reasoning, in order to close its books each fiscal year, a hospital would have to retain an attorney to speculate whether sufficient time has expired since the submission of the cost report and other data such that a court would find prejudice if the Department were to issue a new liability after three years."

The statutory scheme is, as stated, less than clear. But it is most unlikely that the Legislature intended to give the department years, perhaps decades, to settle an account. I would affirm the judgment of the Court of Appeal.